Michael D. Braun (SBN 167416)
**KUZYK LAW, LLP**
2121 Avenue of the Stars, Ste. 800
Los Angeles, California 90067
Telephone: (213) 401-4100
Facsimile: (213) 401-0311
Email: mdb@kuzykclassactions.com

Peter N. Wasylyk (pro hac vice pending)
**LAW OFFICES OF PETER N. WASYLYK**
1307 Chalkstone Avenue
Providence, RI 02908
Telephone: (401) 831-7730
Facsimile: (401) 861-6064
Email: pnwlaw@aol.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CORINNE PEARSON-MARTINEZ on behalf of herself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BIMBO BAKERIES USA, INC.**<br><br>**Defendant.** | **CASE NO.:** '26CV3576 JES SBC<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |

Plaintiff Corinne Pearson-Martinez ("Plaintiff"), individually and on behalf of herself and all others similarly situated, brings this class action against Defendant Bimbo Bakeries, USA, Inc. ("Defendant"), and on the basis of personal knowledge, information and belief, and the investigation of counsel, alleges as follows:

## INTRODUCTION

1. This is a proposed class action on behalf of a California class of consumers seeking redress for Defendant's deceptive practices associated with the advertising, labeling, and sale of its Oroweat Breads ("Products") which claim to be "free from artificial preservatives."[1]




[1] Class Products include: Whole Grains 12 Grains and Seeds; Whole Grains Healthy Multigrain, Whole Grains 100% Whole Wheat.




INGREDIENTS: WHOLE WHEAT FLOUR, WATER, BULGUR WHEAT, SUGAR, SOYBEAN OIL, WHEAT GLUTEN, HONEY, YEAST, WHOLE WHEAT, CULTURED WHEAT FLOUR, SALT, SOY LECITHIN, GRAIN VINEGAR, NATURAL FLAVORS, CITRIC ACID, SOY, WHEY. R20-090-201207

**CONTAINS WHEAT, SOY, MILK.**

**MADE IN A BAKERY THAT MAY ALSO USE EGG, TREE NUTS.**




INGREDIENTS: WHOLE WHEAT FLOUR, WATER, WHEAT GLUTEN, WHOLE GRAINS [WHEAT, RYE, CORN, OATS, MILLET, TRITICALE, BROWN RICE, BARLEY, BUCKWHEAT, KAMUT® (KHORASAN WHEAT), TEFF], SUNFLOWER SEEDS, SUGAR, BROWN AND GOLDEN FLAXSEED, OAT FIBER, VEGETABLE OIL (SOYBEAN), SEA SALT, NATURAL FLAVORS, YEAST, FERMENTED WHEAT FLOUR, SOY LECITHIN, BLACK CHIA SEEDS, KANIWA SEEDS, POPPY SEEDS, GRAIN VINEGAR, CITRIC ACID, SOY, WHEY, HAZELNUTS (FILBERTS).

**CONTAINS WHEAT, SOY, MILK, HAZELNUTS (FILBERTS).**

**MADE IN A BAKERY THAT MAY ALSO USE SESAME.** R25-071-PH202785

2. Unfortunately, the claim that its Products are free from artificial preservatives is false and misleading, as they each contain a material amount of an artificial preservative in the form of citric acid.

3. Despite unequivocally and boldly claiming that its Products are "**FREE FROM ARTIFICIAL PRESERVATIVES**," the inclusion of manufactured citric acid belies this representation, rendering it false, misleading, and in violation of the law.

4. Defendant knows that consumers are willing to pay more for products that are labeled as free of artificial preservatives because they perceive them to be healthier alternatives to similar products that contain artificial preservatives. Indeed, Defendant advertises its Products with the intention that consumers rely on the representation made on the packaging that the Products are "free from artificial preservatives."

5. Reasonable consumers such as Plaintiff do not have specialized knowledge necessary to identify various ingredients in the Products as being inconsistent with Defendant's advertised claim of being "free from artificial preservatives."

6. By falsely labeling the Products as being "free from artificial preservatives," Defendant has profited from consumers' preference for products that are perceived to be healthier by being devoid of artificial preservatives.

7. Throughout the applicable Class Periods (defined below), Defendant has falsely represented the true nature of its Products, and as a result of this false and misleading labeling, was able to sell these Products to hundreds of thousands of unsuspecting consumers throughout California.

8. Plaintiff alleges that Defendant's conduct is in breach of warranty, violates California's Business and Professions Code § 17200, *et. seq.,* California's Business & Professions Code § 17500, *et. seq.,* California Civil Code § 1750, *et seq*.,

and is otherwise grounds for restitution on the basis of quasi-contract/unjust enrichment.

## JURISDICTION AND VENUE

9. Jurisdiction of this Court is proper under 28 U.S.C. § 1332(d)(2). Diversity jurisdiction exists as Plaintiff Pearson-Martinez is a resident of La Mesa, California. Defendant Bimbo is a Delaware corporation headquartered in Irving Texas. The amount in controversy exceeds $5,000,000 for the Plaintiff and members of the Class collectively, exclusive of interest and costs, by virtue of the combined purchase prices paid by Plaintiff and members of the putative Class, and the profits reaped by Defendant from its transactions with Plaintiff and the Class, as a direct and proximate result of the wrongful conduct alleged herein, and by virtue of the injunctive and equitable relief sought.

10. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the underlying transactions and events complained of occurred and affected persons and entities located in this judicial district, and Defendant has received substantial compensation from such transactions and business activity in this judicial district.

## PARTIES

11. Plaintiff Pearson-Martinez is a resident of La Mesa, California.

12. Ms. Pearson-Martinez is a frequent purchaser of Oroweat's Whole Grains 100% Whole Wheat bread. Her most recent purchase was in May 2026 from Food 4 Less Grocery Store located at 7730 Hazard Center Dr. San Diego, CA 92108.

13. When Ms. Pearson-Martinez purchased the Products she saw the representation on their labels claiming that they were free of artificial preservatives. It was a material representation on which she relied in making her decision to purchase the Product.

14. Ms. Pearson-Martinez believed the representations on the Products' labels were accurate, particularly in that they contained no artificial preservatives.

15. Ms. Pearson-Martinez believed that Defendant lawfully marketed and sold the Products.

16. Ms. Pearson-Martinez relied on Defendant's labeling and was misled thereby.

17. Ms. Pearson-Martinez would not have purchased the Products, or would have purchased the Products on different terms had she known the truth about their contents.

18. Ms. Pearson-Martinez was injured in fact and lost money as a result of Defendant's improper conduct.

19. If Ms. Pearson-Martinez had occasion to believe that Defendant's marketing and labeling are truthful, non-misleading, and lawful, she would purchase Defendant's Products in the future.

20. Defendant Bimbo Bakeries USA, Inc, is one of the largest commercial baking companies in the United States and a subsidiary of Grupo Bimbo, the world's largest baking company.[2] Bimbo manufactures and sells the Oroweat branded Products at issue in this action.

## GENERAL ALLEGATIONS

### A. Citric Acid is A Preservative

21. The federal Food Drug & Cosmetic Act ("FDCA") defines a chemical preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or

---

[2] https://www.bimbobakeriesusa.com/about-us (describing Bimbo Bakeries USA as "part of Grupo Bimbo, the world's largest baking company with operations in 39 countries").

oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." 21 C.F.R. §101.22(a)(5). "A food to which a chemical preservative(s) is added shall…. bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, *e.g*., "preservative," "to retard spoilage," "a mold inhibitor," "to help protect flavor," or "to promote color retention." 21 C.F.R. §101.22(j).

22. Chemical preservation is the process of adding ingredients to a food for the purpose of preventing potential damage from oxidation, rancidity, microbial growth, or other undesirable changes. Chemical preservatives may be both natural or synthetic and function one of several ways — (a) as an antimicrobial agent to destroy bacteria or inhibit the growth of mold on foods; (b) as an antioxidant to inhibit oxidation and resulting rancidity; and/or (3) as a chelating agent which binds metal ions in certain foods to prevent oxidation.

23. Citric acid is a preservative within the meaning of 21 C.F.R. §101.22. Indeed, in a consumer facing publication, *Food Ingredients and Colors*, the Food and Drug Administration ("FDA") unequivocally identifies citric acid as a preservative.[3] The sentiment is reaffirmed in the Substances Added to Food database maintained by the FDA, in which the principal technical effects of citric acid are identified as preservative functions.[4] It was also made clear by the FDA in a Warning Letter issued

---

[3] *Food Ingredients and Colors*, International Food Information Council Foundation and U.S. Food and Drug Administration, specifically identifies the following as preservatives: ascorbic acid, **citric acid**, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E). Available at https://www.fda.gov/files/food/published/Food-Ingredients-and-Colors-%28PDF%29.pdf (last visited June 10, 2026)

[4] The Substances Added to Food Database formerly Everything Added to Foods in the United States, available at https://www.cfsanappsexternal.fda.gov/scripts/fdcc/?set=FoodSubstances&sort=Sortte

to Chiquita Brands International, Inc. and Fresh Express, Incorporated, October 6, 2010 stating that its products "are further misbranded within the meaning of section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the chemical preservative citric acid, but their labels fail to declare these preservatives with a description of their functions. 21 CFR §101.22."[5]

24. Citric acid's primary use is as a preservative, despite potentially having additional functions.[6] It functions as a preservative in the Products, regardless of Defendant's subjective purpose(s) for adding it to the Products, and regardless of any other functions citric acid may perform.

### B. The Citric Acid Used in Defendant's Product is an Artificial Preservative

25. Citric acid is among the most common food additives used today. It occurs naturally in certain fruits and vegetables and historically was extracted from citrus fruits such as lemons. While "[t]he average consumer [][remains] under the impression that the added citric acid listed in the ingredients of prepared foods, beverages and vitamins is derived from natural sources such as lemons and limes," … the ingredient list is quite misleading since the added citric acid is not procured through natural sources. More accurate terminology would list this substance as *manufactured citric acid ("MCA")*."[7]

---

rm_ID&order=ASC&startrow=1&type=basic&search=citric%20acid (last visited June 10, 2026)

[5] http://fda-warning-letters.blogspot.com/2010/10/fresh-express-incorporated-10610.html (last visited June 10, 2026).

[6] FBC Industries, *Citric Acid: One of The Most Important Preservatives in The World,* Available at https://fbcindustries.com/citric-acid-one-of-the-most-important-preservatives-in-the-world/ (last visited June 10, 2026).

[7] Sweis, I, et al., *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A*

26. As commercial demand for citric acid increased, scientists sought alternative means to produce it and in the early 20th century discovered that citric acid could be acquired more cheaply through a chemical fermentation process – the method by which nearly all the commercially available citric acid is produced today.[8] The overwhelming majority of this manufactured citric acid is made using a mutant strain of the black mold *Aspergillus niger*.[9]

27. As explained by the United States Department of Agriculture Agricultural Marketing Service ("USDA AMS"), "[t]raditionally by extraction from citrus juice, [citric acid is] no longer commercially available. It is now extracted by fermentation of a carbohydrate substance (often molasses) by citric acid bacteria, *Aspergillus niger* (a mold) or *Candida guilliermondii* (a yeast). Citric acid is recovered from the fermentation broth by a lime and sulfuric acid process in which the citric acid is first precipitated as a calcium salt and then reacidulated with sulfuric acid."[10]

28. By all accounts, MCA is considered artificial. As a preliminary matter, the manufacturing process for food-grade citric acid uses synthetic industrial solvents. The FDA has codified the "[s]olvent extraction process for citric acid" at 21 C.F.R. §

---

*series of four case reports*, Toxicology Reports (2018) ("Sweis"). Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6097542/.

[8] Independent Chemical, *Comon Uses of Citric Acid*, April 1, 2019. Available at https://independentchemical.com/blogs/common-uses-of-citric-acid-20045.aspx (last visited June 10, 2026).

[9] Sweis, Supra n. 7.

[10] NOSB Materials Database, Citric Acid, Chemistry. Available at https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%201995.pdf (last visited June 10, 2026).

173.280, which provides that the "recovery of citric acid from conventional *Aspergillus niger* fermentation liquor may be safely used to produce food-grade citric acid in accordance with the following conditions: (a) The solvent used in the process consists of a mixture of *n*-octyl alcohol meeting the requirements of § 172.864 of this chapter, ***synthetic*** isoparaffinic petroleum hydrocarbons meeting the requirements of § 172.882 of this chapter, and tridodecyl amine." (Emphasis added.)

29. The National Organic Standards Board similarly concluded that citric acid produced by fermentation of carbohydrate substrates and purified by the lime-sulfuric acid method "is synthetic because the citric acid comes into contact with lime and sulfuric acid and because of the chemical change from citric acid to calcium citrate and then back to citric acid during purification."[11]

30. The U.S. Environmental Protection Agency ("EPA") published a supply chain profile for citric acid that illustrates its industrial manufacturing process. The process begins with a corn substrate -- corn starch that has been enzymatically hydrolyzed into glucose syrup by industrial enzymes. *A. niger* is introduced and subjected to deliberate metabolic stress — trace metal starvation, excess carbon, forced low pH to produce calcium citrate. The citric acid is then recovered and refined through methods including the lime/sulfuric acid method, the solvent extraction method, or the ion exchange method – commonly using industrial chemicals such as sulfuric acid and calcium hydroxide."[12]

---

[11] NOSB Materials Database, OFPA Criteria § 2119(m)3). Available at https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%201995.pdf (last visited June 10, 2026).

[12] EPA, Citric Acid Supply Chain Profile. Available at https://www.epa.gov/system/files/documents/2023-03/Citric%20Acid%20Supply%20Chain%20Profile.pdf.




31. In addition to the chemical processing, the *Aspergillus niger* mold strains used in the production of MCA themselves have been subjected to extensive genetic modification, resulting in "countless generations of genetically modified mutant variants,[] specialized for industrial-scale economics."[13]

32. The U.S. Food & Drug Administration has similarly determined that MCA is not natural. The FDA has sent warning letters to food manufacturers for using the term "natural" or "all natural" on products containing citric acid. In a warning letter to Hirzel Canning Company, the FDA stated that its policy regarding the use of the term "natural" "means that nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected to be in the food," and that "the addition of calcium chloride and citric acid to these products preclude use of the term 'natural' to describe this product."[14] The FDA issued a substantially identical

---

[13] Serge Gregoire, *Avoid citric acid: a mold byproduct!* (July 13, 2021), available at https://www.linkedin.com/pulse/avoid-citric-acid-mold-byproduct-serge-gregoire/ (last visited June 10, 2026)

[14] FDA Warning Letter to Hirzel Canning Company (Aug. 29, 2001) attached hereto as Exhibit A.

warning to Oak Tree Farm Dairy, Inc., stating that the use of the terms "100% Natural" and "All Natural" was inappropriate "because it contains citric acid."[15]

33. Finally, at its most basic level, the dictionary definition of the term artificial (*i.e.*, something made or produced by human beings through industrial processes, as opposed to occurring naturally) squarely applies to MCA. *e.g.*, "made, produced, or done by humans especially to seem like something natural;" [16] "made by people, often as a copy of something natural." [17] Manufactured citric acid, which is produced through industrial fermentation using genetically modified mold strains, chemical solvents including synthetic petroleum hydrocarbons, and multi-step chemical extraction processes, plainly qualifies as artificial under any common understanding of the term.

34. Defendant Bimbo Bakeries USA, Inc. is the largest commercial baking company in the United States and a subsidiary of Grupo Bimbo, the world's largest baking company.[18] Bimbo Bakeries manufactures and sells the Oroweat-branded Products at issue in this action through large-scale commercial baking operations at its bakeries across the United States.[19] Given the industrial scale of Defendant's operations, Defendant does not—and could not—source the citric acid used in the Products from natural citrus fruit extraction. Like virtually all commercial food

---

[15] FDA Warning Letter to Oak Tree Farm Dairy, Inc. (Aug. 16, 2001) attached hereto as Exhibit B.

[16] Merriam-Webster, available at https://www.merriam-webster.com/dictionary/artificial?src=search-dict-box (last visited June 10, 2026)

[17] Cambridge Dictionary, Available at https://dictionary.cambridge.org/us/dictionary/english/artificial (last visited June 10, 2026)

[18] https://www.bimbobakeriesusa.com/about-us (last visited June 10, 2026)

[19] *Id.*

manufacturers, Defendant uses industrially manufactured citric acid produced through the *Aspergillus niger* fermentation process described above. The citric acid in Defendant's Products is artificial.

**C. The Citric Acid in Defendant's Products Operates as a Preservative**

35. Preservatives slow product spoilage caused by mold, air, bacteria, fungi or yeast (antimicrobials) and slow or prevent changes in flavor and delay rancidity (antioxidants). Citric acid acts as a preservative by increasing the acidity of a microbe's environment, making it harder for bacteria and mold to survive and reproduce.

36. The FDA broadly defines a food additive as any substance added to food. More specifically, the term refers to "any substance the intended use of which results or may reasonably be expected to result — directly or indirectly — in its becoming a component or otherwise affecting the characteristics of any food."[20] This definition includes any substance used in the production, processing, treatment, packaging, transportation or storage of food. The citric acid identified in the ingredient list of Defendant's Products is not naturally occurring, but rather is a chemical preservative specifically added as part of the Products' formulation.

37. Moreover, citric acid is effective as, and functions as, a preservative in Defendant's Products even when used in relatively low quantities. Thus, even if citric acid is present in the Products at low quantities, Defendant's "free from artificial preservatives" representation is false, deceptive, and misleading for two independent

[20] *Understanding How the FDA Regulates Food Additives and GRAS Ingredients,* Current as of 07/06/23. Available at https://www.fda.gov/food/food-additives-and-gras-ingredients-information-consumers/understanding-how-fda-regulates-food-additives-and-gras-ingredients#:~:text=A%20food%20additive%20is%20defined,the%20characteristics%20of%20any%20food (last visited June 10, 2026).

reasons: (1) they contain added citric acid, which is undeniably a chemical preservative; and (2) they contain citric acid in quantities that are sufficient to tend to preserve and otherwise function as preservatives in the Products.[21]

38. Plaintiff conducted an independent chemical analysis of multiple units of Defendant's Products to determine the amounts of citric acid, as well as the Product's acidity as reflected in terms of pH.

39. The measured pH of the Products were between 5.49 and 5.54 - a borderline high-acid food. High-acid foods have a pH below 4.6, which is acidic enough to prevent the growth of clostridium botulinum and other pathogens. Products having a higher pH require additional means of preservation to prevent spoilage, ranging from heat application (pasteurization) to water activity and oxygen control. The measured citric acid concentrations were between 0.458 mg/g (0.0458%) and 1.03 mg/g (0.103%). In 1 L of pure water, this concentration of citric acid would have a pH of approximately 2.6-2.7 -- an amount sufficient to acidify the bread and contribute to its preservation.

**D. Consumer Demand For No Artificial Ingredients**

40. The clean label movement has been called "the largest shift in American food habits since World War II."[22] The term encompasses many things, but is most often associated with foods that are natural, healthy, and devoid of additives and

---

[21] *Olmos v. T. Marzetti Co.*, 2022 U.S. Dist. LEXIS 236205 *29 (finding Defendant's argument unpersuasive with respect to Plaintiffs' claims that citric acid always functions as a preservative even if it is at a very low level in the products).

[22] *Clean Labels, Public Relations or Public Health*, Center For Science in the Public Interest (2017), available https://www.cspinet.org/sites/default/files/2022-03/Clean%20Label%20report.pdf (last visited June 15, 2026).

preservatives.[23] Consumer interest in clean labels is driven by health concerns. A recent survey found that healthfulness was among the biggest drivers of food-purchasing decisions and that that "limited or no artificial preservatives" is one of the top ways Americans define healthy eating.[24] Nearly 70% of consumers say they would pay more for food and beverage products with a clean label.[25]

41. By representing the Products are "free from artificial preservatives," Defendant seeks to capitalize on consumer preference for clean label products. Indeed, "[foods bearing 'free-from' claims are increasingly relevant to Americans, as they perceive the products as closely tied to health."[26] "84 percent of Americans buy "free-from" foods because they believe them to be more natural or less processed." Among such consumers, preservative free ranks "[a]mong the top claims… deem[ed] most important." *Id.*

---

[23] *Clean label trend is evolving - consumers still willing to pay a price premium*, Valio, May 29, 2023. Available at https://www.valio.com/food-solutions-for-companies/articles/clean-label-trend-is-evolving-and-consumers-willing-to-pay-a-price-premium/ (last visited June 15, 2026).

[24] International Food Information Council. 2016 Food & Health Survey: consumer Attitudes toward Food Safety, Nutrition & Health, commissioned by the International Food Information Council (IFIC) Foundation. 2016 Food & Health Survey https://ific.org/wp-content/uploads/2025/04/2016-Food-and-Health-Survey-Report_-FINAL_0.pdf. (last visited June 15, 2026).

[25] https://www.kalsec.com/natural-food-protection/insights/clean-label-food-preservation. (last visited June 15, 2026).

[26] *See, Free-from Food Trends US 2015 Report,* MINTEL, Available at https://www.mintel.com/press-%20centre/food-and-drink/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed (last accessed June 15, 2026).

42. In a survey undertaken by L.E.K, around 1600 consumers were asked which claims were the most important to them when buying food and drink products. Results indicated the most popular claim to be "no artificial ingredients."[27]

Figure 2
Percentage of US consumers purchasing 'frequently or always' based on food claim (2018)




Note: Question: How frequently has your household purchased food with the following attributes or claims over the past 12 months when they were available?
Source: L.E.K. Consumer Survey and analysis

43. By failing to properly label its Products, Defendant has misled and deceived consumers in violation of the laws pled herein.

44. As a result of Defendant's unlawful and deceptive conduct, Plaintiff and members of the Class have been harmed.

## ECONOMIC INJURY

45. Plaintiff sought to buy Products that were lawfully labeled, marketed, and sold.

46. Plaintiff saw and relied on Defendant's misleading labeling of its Products.

---

[27] L.E.K., https://www.lek.com/insights/ei/clean-label-food-ingredients (last visited August 30, 2024); Food Industry Executive, Consumers Say They Want to Eat Healthy, March 4, 2019. Available at https://foodindustryexecutive.com/2019/03/consumers-say-they-want-to-eat-healthy/ (last visited June 15, 2026).

47. Plaintiff believed that the purchased Products were free of artificial preservatives.

48. Plaintiff believed that the Products were lawfully marketed and sold.

49. In reliance on the claims made by Defendant regarding the qualities of its Products, Plaintiff paid a price premium.

50. As a result of her reliance on Defendant's misrepresentations, Plaintiff received Products that contained ingredients which she reasonably believed they did not contain.

51. Plaintiff received Products that were unlawfully marketed and sold.

52. Plaintiff lost money and thereby suffered injury as she would not have purchased these Products and/or paid as much for them absent the misrepresentation.

53. Defendant knows that the claim the Products are free of preservatives is material to a consumer's purchasing decision.

54. Plaintiff altered her position to her detriment and suffered damages in an amount equal to the amounts she paid for the Products they purchased, and/or in additional amounts attributable to the deception.

55. By engaging in the false and deceptive conduct alleged herein, Defendant reaped, and continues to reap financial benefits in the form of sales and profits from its Products.

56. Plaintiff, however, would be willing to purchase Products again in the future should she be able to rely on Defendant's marketing as truthful and non-deceptive.

## CLASS ACTION ALLEGATIONS

57. Plaintiff brings this action on behalf of herself and on behalf of classes of all others similarly situated consumers defined as follows:

a. **California:** All persons in California who purchased the Class Products in California during the Class Period.

b. **Class Period** is the maximum time allowable as determined by the statute of limitation periods accompanying each cause of action.[28]

58. Plaintiff brings this Class pursuant to Federal Rule of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3) and 23(c)(4).

59. Excluded from the Class are: (i) Defendant and its employees, principals, affiliated entities, legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned.

60. Upon information and belief, there are tens of thousands of members of the Class. Therefore, individual joinder of all members of the Class would be impracticable.

61. There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

62. Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal or factual questions include but are not limited to:

a. Whether Defendant marketed, packaged, or sold the Class Products to Plaintiff and those similarly situated using false,

[28] The statute of limitations for Plaintiff's claims under California Civil Code § 1750, *et seq*., and for unjust enrichment is 3 years. Accordingly for these claims the Class Period begins 3 years from the date of the initial filing to the present. Plaintiff's claims under California's Business and Professions Code § 17200, *et. seq.,* California's Business & Professions Code § 17500, *et. seq.,* and for breach of express warranty have a statute of limitations of 4 years.

misleading, or deceptive statements or representations;

b. Whether Defendant omitted or misrepresented material facts in connection with the sales of its Products;

c. Whether Defendant participated in and pursued the common course of conduct complained of herein;

d. Whether Defendant has been unjustly enriched as a result of its unlawful business practices;

e. Whether Defendant's actions violate the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq*. (the "UCL");

f. Whether Defendant's actions violate the False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq*. (the "FAL");

g. Whether Defendant's actions violate the Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq*. (the "CLRA");

h. Whether Defendant should be enjoined from continuing the above-described practices;

i. Whether Plaintiff and members of the Class are entitled to declaratory relief; and

j. Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the above-described practices.

63. Plaintiff's claims are typical of the claims of the Class, in that Plaintiff was a consumer who purchased Defendant's Products. Plaintiff is no different in any relevant respect from any other Class member who purchased the Products, and the relief sought is common to the Class.

64. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class she seeks to represent, and she has retained counsel competent and experienced in conducting complex class

action litigation. Plaintiff and her counsel will adequately protect the interests of the Class.

65. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member likely will be relatively small, especially given the relatively small cost of the Products at issue and the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's conduct. Thus, it would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Moreover, even if members of the Class could afford individual actions, it would still not be preferable to class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

66. In the alternative, the Class may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary and final equitable relief with respect to each Class.

67. The requirements for maintaining a class action pursuant to Rule 23(b)(2) are also met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
**Breach of Express Warranty**
**Cal. Com. Code §2313**

68. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

69. Defendant made express warranties to Plaintiff and members of the Class that the Products contained "No Artificial Preservatives"."

70. The express warranties made to Plaintiff and members of the Class appear on every Product label. This warranty regarding the nature of the Product marketed by Defendant specifically relates to the goods being purchased and became the basis of the bargain.

71. Plaintiff and the Class purchased the Products in the belief that they conformed to the express warranties that were made on the Products' labels.

72. Defendant breached the express warranties made to Plaintiff and members of the Class by failing to supply goods that conformed to the warranties it made. As a result, Plaintiff and members of the Class suffered injury and deserve to be compensated for the damages they suffered.

73. Plaintiff and the members of the Class paid money for the Products. However, Plaintiff and the members of the Class did not obtain the full value of the advertised Products. If Plaintiff and other members of the Class had known of the true nature of the Products, they would not have purchased them or paid less for them. Accordingly, Plaintiff and members of the Class have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

74. Plaintiff and the Class are therefore entitled to recover damages, punitive damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

## SECOND CAUSE OF ACTION

**Unlawful" Business Practices in Violation of**
**The Unfair Competition Law ("UCL")**
**Bus. & Prof. Code §§17200, *et seq*.)**

75. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

76. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

77. A business act or practice is "unlawful" if it violates any established state or federal law.

78. Defendant's acts, omissions, misrepresentations, practices, and/or non-disclosures concerning the Products alleged herein, constitute "unlawful" business acts and practices in that they violate the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§301, et seq. and its implementing regulations, including, at least, the following sections:

a. 21 U.S.C. §343(a), which deems food misbranded when its labeling contains a statement that is false or misleading in any particular;
b. 21 C.F.R. §102.5(a)-(d), which prohibits the naming of foods so as to create an erroneous impression about the presence or absence of ingredient(s) or component(s) therein;
c. 21 U.S.C. §§331 and 333, which prohibits the introduction of misbranded foods into interstate commerce.

79. California's Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code §109875 *et seq*., broadly prohibits the misbranding of food. Cal. Health & Safety Code §110765; *See, also* Cal. Health & Safety Code

§110660 ("Any food is misbranded if its labeling is false or misleading in any particular."). The Sherman Law incorporates all food labeling regulations and any amendments to those regulations adopted pursuant to the Food, Drug, and Cosmetic Act of 1938 as the food labeling regulations of California. Cal. Health & Safety Code §§110100(a), 110665, 110670.

80. As described in detail above, by failing to label the Products in a manner that accurately represents its contents, Defendant generally violates 21 U.S.C. §343(a)(1) ("a food shall be deemed to be misbranded if its labeling is false or misleading in any particular") as incorporated by California's Sherman Law. Independently, by mislabeling the Products, Defendant violates Cal. Health & Safety Code § 110660 ("any food is misbranded if its labeling is false or misleading in any particular.")

81. Defendant violated and continues to violate the Sherman Law, Article 6, Section 110660, and hence has also violated and continues to violate the "unlawful" prong of the UCL through the false labeling of its Product.

82. Defendant's identical conduct that violates the Sherman Law, also violates FDCA §403(a)(1), 21 U.S.C. §343(a)(1), which declares food misbranded under federal law if its "labeling is false and misleading in any particular." This identical conduct serves as the sole factual basis of each cause of action brought by this Complaint, and Plaintiff does not seek to enforce any of the state law claims to impose any standard of conduct that exceeds or otherwise violates the FDCA.

83. By committing the unlawful acts and practices alleged above, Defendant has engaged, and continues to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§17200, *et seq.*

84. Through its unlawful acts and practices, Defendant has obtained, and continues to unfairly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and all members of the Class, to disgorge the profits Defendant made on these transactions,

and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an order is not granted.

85. In accordance with California Business & Professions Code section 17203, and as Plaintiff lacks an adequate remedy at law, they seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

**<u>THIRD CAUSE OF ACTION</u>**
**("Unfair" Business Practices in Violation of**
**The Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq*.)**
**(On Behalf of the California Subclass)**

86. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

87. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

88. A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

89. Defendant has violated, and continues to violate, the "unfair" prong of the UCL through its misleading description of the Products. The gravity of the harm to members of the Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications, or motives of Defendant for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Defendant engaged, and continues to engage, in unfair business practices within the meaning of California Business and Professions Code §§17200, *et seq.*

90. Through its unfair acts and practices, Defendant obtained, and continue to unfairly obtain, money from members of the Class. As such, Plaintiff has been injured

and requests that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, to disgorge the profits Defendant made on its Products, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

91. In accordance with California Business & Professions Code section 17203, and as Plaintiff lacks an adequate remedy at law, she seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

## FOURTH CAUSE OF ACTION

**(“Fraudulent” Business Practices in Violation of The Unfair Competition Law (“UCL”), Bus. & Prof. Code §§ 17200, *et seq*.) (On Behalf of the California Subclass**

92. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

93. The UCL defines unfair business competition to include any “unlawful, unfair or fraudulent” act or practice, as well as any “unfair, deceptive, untrue or misleading” advertising. Cal. Bus. & Prof. Code §17200.

94. A business act or practice is “fraudulent” under the Unfair Competition Law if it actually deceives or is likely to deceive members of the consuming public.

95. Defendant’s acts and practices of mislabeling its Products in a manner to suggest they contained “no artificial preservatives.”

96. As a result of the conduct described above, Defendant has been, and will continue to be, unjustly enriched at the expense of Plaintiff and members of the proposed Class. Specifically, Defendant has been unjustly enriched by the profits they have obtained from Plaintiff and the Class from the purchases of their Products.

97. Through its fraudulent acts and practices, Defendant has improperly obtained, and continue to improperly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the Class, to disgorge the profits Defendant has made, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

98. In accordance with California Business & Professions Code section 17203, and as Plaintiff lacks an adequate remedy at law, they seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

**FIFTH CAUSE OF ACTION**
**(False Advertising in Violation of**
**California Business & Professions Code §§ 17500, *et seq*.)**
**(On Behalf of the California Subclass)**

99. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

100. Defendant uses advertising and packaging to sell its Products. Defendant disseminates advertising regarding its Products which by its very nature is deceptive, untrue, or misleading within the meaning of California Business & Professions Code §§17500, *et seq.* because those advertising statements contained on the labels are misleading and likely to deceive, and continue to deceive, members of the putative Class and the general public.

101. In making and disseminating the statements alleged herein, Defendant knew or should have known that the statements were untrue or misleading, and acted in violation of California Business & Professions Code §§17500, *et seq*.

102. The misrepresentations and non-disclosures by Defendant of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of California Business & Professions Code §§17500, *et seq*.

103. Through their deceptive acts and practices, Defendant has improperly and illegally obtained money from Plaintiff and the members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, and to enjoin Defendant from continuing to violate California Business & Professions Code §§17500, *et seq.*, as discussed above. Otherwise, Plaintiff and those similarly situated will continue to be harmed by Defendant's false and/or misleading advertising.

104. Pursuant to California Business & Professions Code §17535, Plaintiff seeks an Order of this Court ordering Defendant to fully disclose the true nature of its misrepresentations. Plaintiff additionally requests an Order: (1) requiring Defendant to disgorge its ill-gotten gains, (2) award full restitution of all monies wrongfully acquired by Defendant, and (3) interest and attorneys' fees. Plaintiff and the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

105. As a result, and as they lack an adequate remedy at law, Plaintiff and the Class are entitled to equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched, and pray for relief as set forth below.

## SIXTH CAUSE OF ACTION

**(Violation of the Consumers Legal Remedies Act,**
**California Civil Code §§ 1750, *et seq*.)**
**(On Behalf of the California Subclass)**

106. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

107. This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq*. (the "CLRA").

108. Plaintiff and each member of the proposed Class are "consumers" within the meaning of Civil Code §1761(d).

109. The purchases of the Products by consumers constitute "transactions" within the meaning of Civil Code §1761(e), and the Products constitute "goods" within the meaning of Civil Code §1761(a).

110. Defendant has violated, and continues to violate, the CLRA in at least the following respects:

a. §1770(5) pertaining to misrepresentations regarding the characteristics of goods sold—specifying that misleading representations regarding ingredients violate the CLRA;
b. §1770(7) pertaining to misrepresentations regarding the standard, quality, or grade of goods sold; and
c. § 1770(9) pertaining to goods advertised with the intent not to provide what is advertised.

111. Defendant knew, or should have known, that the labeling of its Products violated consumer protection laws, and that these statements would be relied upon by Plaintiff and the members of the Class.

112. The representations were made to Plaintiff and all members of the Class. Plaintiff relied on the accuracy of the representations on Defendant's labels, which formed a material basis for their decisions to purchase the Products. Moreover, based on the very materiality of Defendant's misrepresentations uniformly made on or omitted from their Product labels, reliance may be presumed or inferred for all members of the Class.

113. Defendant carried out the scheme set forth in this Complaint willfully, wantonly, and with reckless disregard for the interests of Plaintiff and the Class, and as a result, Plaintiff and the Class have suffered an ascertainable loss of money or property.

114. Plaintiff and the members of the Class request that this Court enjoin Defendant from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above, pursuant to California Civil Code §1780(a)(2). Unless Defendant is permanently enjoined from continuing to engage in such violations of the CLRA, future consumers of Defendant's Products will be damaged by their acts and practices in the same way as Plaintiff and California Subclass Members.

115. In conjunction with this Complaint Plaintiff has served a CLRA demand pursuant to Civil Code §1782, via U.S. Certified Mail Return Receipt notifying Defendant of the conduct described herein and that such conduct was in violation of particular provisions of Civil Code §1770. If Defendant fails to take corrective action within thirty days, Plaintiff will amend the complaint to seek the full measure of damages as provided under Civil Code §1780.

116. Plaintiff requests that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1782. If Defendant is not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the class will continue to suffer harm. Plaintiff and those similarly situated have no adequate remedy at law to stop Defendant's continuing practices.

## SEVENTH CAUSE OF ACTION
### Restitution Based On Quasi-Contract/Unjust Enrichment

117. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

118. Defendant's conduct in enticing Plaintiff and the Class to purchase Products with false and misleading packaging is unlawful because the statements contained on the Defendant's Product labels are untrue.

119. Defendant took monies from Plaintiff and the Class for these Products and have been unjustly enriched at the expense of Plaintiff and the Class as a result of their unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on Defendant to restore these ill-gotten gains to Plaintiff and the Class.

120. It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiff and Class members.

121. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the Class are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.

## PRAYER FOR RELIEF

THEREFORE, Plaintiff, on behalf of herself and on behalf of the other members of the Class and for the Counts so applicable on behalf of the general public request an award and relief as follows:

A. An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiff be appointed Class Representative, and Plaintiff's counsel be appointed Lead Counsel for the Class.

B. Restitution in such amount that Plaintiff and all members of the Class paid to purchase Defendant's Product or restitutionary disgorgement of the profits Defendant obtained from those transactions, for Causes of Action for which they are available.

C. Compensatory damages for Causes of Action for which they are available.

D. Other statutory penalties for Causes of Action for which they are available.

E. Punitive Damages for Causes of Action for which they are available.

F. A declaration and Order enjoining Defendant from marketing and labeling its Product deceptively, in violation of laws and regulations as specified in this Complaint.

G. An Order awarding Plaintiff her costs of suit, including reasonable attorneys' fees and pre and post judgment interest.

H. An Order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Defendant as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein.

I. Such other and further relief as may be deemed necessary or appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action or issues so triable.

DATED: June 16, 2026

Respectfully submitted,

Michael D. Braun
**KUZYK LAW, LLP**
2121Avenue of the Stars, Ste. 800
Los Angeles, California 90067
Telephone: (213) 401-4100
Facsimile: (213) 401-0311
Email: mdb@kuzykclassactions.com

Peter N. Wasylyk
**LAW OFFICES OF PETER N. WASYLYK**
1307 Chalkstone Avenue
Providence, RI 02908
Telephone: (401) 831-7730
Facsimile: (401) 861-6064
Email: pnwlaw@aol.com

*Counsel for Plaintiff*

# EXHIBIT A

## Inspections, Compliance, Enforcement, and Criminal Investigations

### Hirzel Canning Company 29-Aug-01

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration
Cincinnati District Office
Central Region
6751 Steger Drive
Cincinnati, OH 45237-3097
Telephone: (513) 679-2700
FAX: (513) 679-2771

August 29, 2001
WARNING LETTER
CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Karl A. Hirzel, President
Hirzel Canning Company
411 Lemoyne Road
Northwood, Ohio 43619

Dear Mr. Hirzel:

During an inspection of you firm on June 13, 2001 our Investigator collected labels for canned tomato products manufactured by your firm. We have limited our review to three of your products, which we have determined to be sufficiently representative of the labeling efficiencies of your products. Our review of the labels collected for the products listed below show that they cause the products to be in violation of Section 403 of the Federal Food Drug , and Cosmetic Act (the Act) and Title 21, Code of Federal Regulations (CFR), Part 101- Food Labeling as follows:

Dei Fratelli CONCENTRATED/ITALIAN STYLE TOMATO PUREE No Salt Added (28 OZ. Cm)

The above product is misbranded within the meaning of Section 403 (a)(l) of the Act in that its labeling 1s false or misleading. The term "FRESH-PACKED" used on the principal display panel, which falsely implies that the finished product in the package is ?fresh," when in fact it has been thermally processed. The Food and drug Administration (FDA) would not object to the use of the term "fresh" in the context of a statement such as "packed from lies tomatoes," provided that the tomatoes were indeed fresh as defined in 1 CFR 101.95 when they were added to the product.

Dei Fratelli Fresh & Read CHOPPED TOMATOES ONION & GARLIC (14.5 oz. cans) and Dei ratelli Fresh & Ready CHOPPED MEXICAN TOMATOES & JALAPENOS (14.5 oz. cans)

The above products are misbranded within the meaning of Section 403 a)(1) of the Act in that their labelin is false or misleading. The statements "FRESH- PACKED" on the principal display panel and "Fresh & Ready" in the brand name of the products falsely imply that the finished products in the package are "fresh," when in fact the have been thermally processed. In addition, according to the ingredient statements, the products contain at east two preservatives. Products that have been thermally processed or that contain preservatives do not meet the definition of "fresh." As stated above, FDA does not object to the use of the term "fresh" in the context of a statement such as "packed from fresh tomatoes," provided that the tomatoes were indeed fresh as defined in 1 CFR 101.95 when they were added to the product.

The Dei Fratelli ® ***. CHOPPED MEXICAN TOMATOES & JALAPENOS product is also misbranded under section 403 (r)((I )(A) of the Act because the label bears the nutrient content claim "HEALTHY," but does not meet the requirements for the claim, as defined in 21 CFR 101.65 (d). Based on the information m the nutrition label, the CHOPPED MEXICAN TOMATOES & JALAPENOS product contains 590 mg of sodium. A "healthy" claim may be used where, among other thing, the product contains no more than 360 mg of sodium.

Furthermore, the Dei Fratelli ® *** CONCENTRATED/ITALIAN STYLE TOMATO PUREE, CHOPPED TOMATOES ONIONS & GARLIC and CHOPPED MEXICAN TOMATOES & JALAPENOS products are misbranded under section 403(r)(l)(A) of the Act because the labels bear nutrient content claims that are not authorize by regulation for the Act or are not consistent with an authorizing regulation. The claims include "** *a great source of Vitamins A and C, and the nutrient Lycopene." In the context used on these labels, the term "great source' is considered to be an unauthorized synonym for "high." FDA has define the nutrient content claim "high" in 21 CFR 101.54(b). ?High" can be used on a food label provided the food contains 20 percent or more of the Reference Daily Intake (RDI) or Daily Reference Value (DRV) per reference amount customarily consumed.

There is no established reference value for Lycopene; therefore, the claim "*** great source of *** Lycopene" is not authorized. In addition, the Dei Fratelli ® *** CONCENTRATE/ITALIAN STYLE TOMATO PUREE does not contain 20% or more of the RDI of vitamin A and the CHOPPED MEXICAN TOMATOES & JALAPENOS does not contain 20% or more of the RDIs for Vitamin A or C.

Some of the labels for your tomato products have a "NO SALT ADDED" statement on products that are not sodium free. However, the required statement, "not a sodium free food" or "not for control of sodium in the diet" does not appear on the information panel of the labels.

We request that you take prompt action to correct these violations. Failure to achieve prompt corrections may result m enforcement action such as seizure and/or injunction being initiated by FDA without further notice.

The above violations are not meant to be an all-inclusive list of deficiencies on your labels. Other label violations can subject your food products to legal action. It is your responsibility to assure that all of your products are labeled in compliance with all applicable statutes enforced by FDA.

You should also be aware that the term "fresh" in the ingredient name "FRESH TOMATOES" should not appear in the ingredient statement as part of the common or usual name of an ingredient. Ingredients must be declared b their common or usual & name, as stated in section 403(I)(2) of the Act and 21 CFR 101.4(a (l). Optional information, such as the term "fresh? is not permitted.

Also, the Dei Fratelli ® *** CHOPPED TOMATOES ONIONS & GARLIC and CHOPPED MEXICAN TOMATOES & JALAPENOS labels bear the term "All-NATURAL," but according to the ingredient statements, calcium chlorid and citric acid are added to the products. We have not established a regulatory definition for the term "natural," however, we discussed its use in the ream le to the food labeling final regulations (58 Federal Register 2407, January 6, 1993). FDA?s policy regarding the use "natural", means that nothing artificial or synthetic as been included in, or as been added to, a food that would not normally be expected to be in the food. Therefore, the addition of calcium chloride and citric acid to these products preclude use of the term "natural" to describe this product.

Please advise us in writing within fifteen(15) working days of receipt of this letter of the specific actions you have taken to correct the violations along with copies of the revised labels. If corrective action cannot be completed within 15 days, state the reason for the delay and the time within which corrections will be completed.

Your reply should be sent to the Food and Drug Administration, 6751 Steger Drive, Cincinnati, Ohio 45237 t the attention of Evelyn D. Forney, Compliance Officer.

Sincerely,
Henry Fielden
District Director
Cincinnati District

Page Last Updated: 08/14/2009
Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Accessibility Contact FDA Careers FDA Basics FOIA No Fear Act Site Map Transparency Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

# EXHIBIT B

## Inspections, Compliance, Enforcement, and Criminal Investigations

## Oak Tree Farm Dairy, Inc. 16-Aug-01

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food & Drug Administratio
New York District
158-15 Liberty Avenu
Jamaica, NY 1143

WARNING LETTER
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
August 16, 2001
Ref: NYK-2001-113

Richard Classey
Vice President and General Manager
Oak Tree Farm Dairy, Inc.
544 Elwood Road
East Northport, NY 11731

Dear Mr. Classey:

On May 17 and June 5 and 7,2001, we inspected your beverage manufacturing facility located at the abov address. During the inspection, we collected a sample of your "OAKTREE REAL BREWED ICED TEA" product and labels for your "OAKTREE FRUIT PUNCH" and "OAKTREE ALL NATURAL LEMONADE" products. Our analysi of the iced tea and review of the labels found serious violations of the Federal Food, Drug, and Cosmetic Act ("the Act") and Title 21, Code of Federal Regulations, Part 101 - ,Food Labeling(21 CFR 101).

The "OAKTREE REAL BREWED ICED TEA" is misbranded under Section 403(i)(2) of the Act in that it contains the color additive "FD&C Red No. 40", but the certified color additive fails to be declared on the product label in the statement of ingredients by its specific name, as required (21 CFR 101.22(k)(1)). The product i also misbranded under Section 403(k) of the Act because it contains an artificial coloring that is not declared on the label.

The "OAKTREE FRUIT PUNCH" is misbranded under Section 403(k) of the Act because it contains sodium benzoate and potassium sorbate, which are not declared on the product label. A food to which a chemical preservative is added must declare the common or usual name of that ingredient and a description of its function, e.g., "preservative", as required by 21 CFR 101.226).

The above violations concern certain new labeling requirements and are not meant to be an all-inclusive lis of deficiencies on your product labels. Other label violations can subject the foods to legal action. It is you responsibility to assure that all of your products are labeled in compliance with all applicable statutes enforced by the Food and Drug Administration ("FDA").

You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory action without further notice. These include seizure and/or injunction.

As you know, during the inspection, our investigator also reviewed the labels and formulations for your "OAKTREE ALL NATURAL LEMONADE" and "OAKTREE FRUIT PUNCH". Your lemonade label fails to declare the ingredient, citric acid, which is declared as an ingredient on the label of the lemonade concentrate used to make your lemonade. Further, your fruit punch label fails to declare the ingredients, grape juice, artificial fruit punch flavor, propylene glycol, sodium benzoate, and potassium sorbate, which are declared as ingredients on the label of the fruit punch concentrate used to make your fruit punch. Also, your fruit punc label declares the ingredients, concentrated pineapple juice, gum arabic, glycerol ester of wood resin, and blue 1.

However, these ingredients are not found in the fruit punch concentrate used to make your fruit punch and are not listed as ingredients in your fruit punch formulation. The investigator discussed these labeling discrepancies with you at the conclusion of the inspection.

The term "all natural" on the "OAKTREE ALL NATURAL LEMONADE" label is inappropriate because the product contains potassium sorbate. Although FDA has not established a regulatory definition for "natural," we discussed its use in the preamble to the food labeling final regulations (58 Federal Register 2407, January 6 1993, copy enclosed). FDA?s policy regarding the use of "natural," means nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected to be in the food. The same comment applies to use of the terms" 100 % NATURAL" and "ALL NATURAL" on the "OAKTREE REAL BREWED ICED TEA" label because it contains citric acid.

Further, the declaration of potassium sorbate in the ingredient statement on the "OAKTREE ALL NATURAL LEMONADE" label must be followed by a description of its function, e.g., "preservative", as required by 21 CFR 101.22(j).

You should notify this office in writing, within 15 working days of receipt of this letter of the specific steps you have taken to correct the noted violations. If corrective action cannot be completed within 15 days, state the reasons for the delay and the time within which the corrections will be completed.

Your reply should be directed to Bruce A. Goldwitz, Compliance Officer, Food and Drug Administration, 158-15 Liberty Avenue, Jamaica, New York 11433. If you have any questions concerning the violations noted, please contact Mr. Goldwitz at (718) 340-7000 ext. 5582.

Sincerely,

/s/

Robert L. Hart

Acting District Director

Page Last Updated: 08/14/2009
Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Accessibility Contact FDA Careers FDA Basics FOIA No Fear Act Site Map Transparency Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

USA.gov

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

U.S. Department of Health & Human Services

Links on this page: